AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

FEB 2 1 2019

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.  1:19-SW-*124*
HYATT PLACE HERNDON DULLES )
13711 SAYWARD BOULEVARD, ROOM 615 )
HERNDON, VIRGINIA 20171 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____ Eastern _____ District of _____ Virginia _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1), 846 | Conspiracy to Distribute Heroin |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

SA Julie Whisenhunt, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/21/19

/s/
Michael S. Nachmanoff
United States Magistrate Judge
*Judge's signature*

City and state:  Alexandria, Virginia

Hon. Michael S. Nachmanoff, U.S. Magistrate Judge
*Printed name and title*

**ATTACHMENT A**

**LOCATION TO BE SEARCHED**

The address known as **13711 SAYWARD BLVD HERNDON, VIRGINIA 20171** is the

HYATT PLACE HERNDON DULLES HOTEL. It is six story hotel comprised of red brick and

light colored concrete. Attached to the center of the structure is an awning and the numbers

"13711" are affixed above the main lobby door in black lettering. The words "Hyatt Place" are

written on the top center of the structure above the front awning. **ROOM 615** is located on the

sixth floor of the hotel. The number 615, in white writing, is located on a brown placard to the

left of the door to the room.

## ATTACHMENT B

## PROPERTY TO BE SEIZED

1.      Drugs and drug paraphernalia, and items used in the sale, transfer, transportation, and packaging of illegal narcotics substances, as well as the use of illegal controlled substances, including scales, butcher paper, boots, plastic wrap, plastic bags, tape, cigarette papers, pipes, hypodermic needles and syringes, written articles on the use and effects of narcotics, diluents and cutting agents.

2.      Items used in the manufacture of illegal narcotics substances, including precursor chemicals, chemistry guides, glassware, and flasks.

3.      Documents related to or memorializing the ordering, purchasing, storage, transportation and sale of controlled substances, including U.S. currency used in the purchase and sale of controlled substances, buyer lists, seller lists, pay-owe sheets and records of sales, log books, drug ledgers, personal telephone and address books of customers and suppliers, rolodexes, telephone answering pads, bank and financial records, records relating to domestic and foreign travel such as tickets, passports, visas, credit card receipts, travel schedules, receipts and records, trucker log books, and storage records, such as storage locker receipts and safety deposit box rental records.

4.      Books, records, receipts, notes and other papers relating to the transportation, ordering, purchase and distribution of controlled substances.

5.      Address and telephone books and papers reflecting names, addresses, and telephone numbers.

6.      Books, records, receipts, bank statements, money drafts, letters of credit, money orders and cashier's checks, passbooks, bank checks, safe deposit box keys, and any other items evidencing the obtaining, secreting, transfer, concealment, storage, and expenditure of money.

7.     United States currency, precious metals, jewelry, and financial instruments.

8.     Photographs, in particular photographs of co-conspirators, assets, and controlled substances.

9.     Weapons, including but not limited to revolvers, semi-automatic pistols, rifles, and ammunition, magazines, bulletproof vests, and firearms-related paraphernalia including, but not limited to gun-cleaning kits, gun-sights, holsters, and receipts and documentation for the purchased of same, and related firearm paraphernalia.

10.    Cellular telephones, cameras, and records and receipts reflecting their ownership and use.

11.    Safes, both combination and key type, and their contents.

12.    Indicia of occupancy and residence of the premises including, but not limited to envelopes and keys.

13.    Any and all electronic data processing and storage devices, computers and computer systems, other digital media, keyboards, Central Processing Units, external and internal drives, external and internal storage devices such as magnetic tapes and disks or diskettes, together with system documentation, operating logs and documentation, software and instruction manuals, passwords, test keys, and encryption codes or similar codes that are necessary to access computer programs.

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

FEB 2 1 2019

...COURT
...VIRGINIA

Alexandria Division

IN THE MATTER OF THE SEARCH OF      )
HYATT PLACE HERNDON DULLES,          )      No.: 1:19-SW-*124*
13711 SAYWARD BOULEVARD, ROOM 615    )
HERNDON, VIRGINIA 20171              )

AFFIDAVIT IN SUPPORT OF A SEARCH AND SEIZURE WARRANT

I, Julie Whisenhunt, Special Agent of the Drug Enforcement Administration (DEA),
Washington Division Office (WDO), Washington, D.C., being duly sworn, depose and state the
following:

1.      This affidavit is presented in support of an application for a warrant to search
Room 615 of the Hyatt Place Herndon Dulles located at 13711 Sayward Boulevard in Herndon,
Virginia, 20171 (the "SUBJECT PREMISES"), as further described in Attachment A, and to
seize evidence, as further described in Attachment B, related to narcotics trafficking in violation
of 21 U.S.C. §§ 841(a)(1) and 846.

2.      I have included in this affidavit information necessary to support probable cause
for the search warrant application. It is not intended to include each and every fact and matter
observed by me or known to the government regarding the investigation. I have set forth only
those facts necessary to support probable cause.

I. Background

3.      I am an "investigative or law enforcement officer" of the United States within the
meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States
who is empowered by law to conduct investigations of and to make arrests for offenses
enumerated in Section 2516 of Title 18, United States Code. I have been a Special Agent of the

1

DEA since January 1997. During my time in law enforcement, I have participated in the application for and execution of numerous arrest and search warrants in the investigation of narcotics and organized crime related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, and other evidence of criminal activity.

4.      As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled dangerous substances.

5.      Based upon this experience, I have become knowledgeable of the methods and modes of narcotics operations, and the language and patterns of drug abuse and trafficking. During the course of my participation in investigations of narcotics trafficking organizations, I have testified at trial, in grand jury proceedings, and at probable cause and detention hearings. Through my employment with the DEA, I have gained knowledge in the use of various investigative techniques including the utilization of wiretaps, physical surveillance, undercover agents, confidential informants and cooperating witnesses, the controlled purchases of illegal narcotics, electronic surveillance, consensually monitored recordings, investigative interviews, financial investigations, the service of administrative and grand jury subpoenas, and the execution of search and arrest warrants.

6.      Based on my training and experience, I am aware that:

a. Drug traffickers often maintain, on their persons, in their vehicles, and in their residences, large amounts of United States currency in order to maintain and finance their ongoing criminal activities.

b. Drug traffickers commonly make and maintain business records. Individuals involved in the manufacture, sale, purchase, and transportation of controlled substances generate and maintain writings, books, records, receipts, notes, ledgers, lists, airline tickets, money orders, package and shipping labels, and other memoranda to assist in their criminal activities. These materials are created and maintained in much the same way and for the same reasons as in legitimate businesses, namely, because drug traffickers, like legitimate business persons, must know the current status of the various illegal transactions in which they are involved. However, because drug trafficking is, by its very nature, clandestine and involves multiple complex financial transactions, the possibility of error and mistake is considerable due to the number, complexity and frequency of the various transactions without the aid of records.

c. Drug traffickers commonly conceal contraband, including controlled substances, proceeds of drug sales, and records of drug transactions in secure locations within their residences and on their properties so that they may be readily accessed and concealed from law enforcement.

d. Drug traffickers conceal in their residences drugs, currency, financial instructions, precious metals, jewelry, and other items related to financial

3

transactions of obtaining, transferring, secreting, or spending large sums of money made from engaging in narcotics trafficking activities.

e.  Drug traffickers often amass proceeds from the sale of controlled substances and attempt to deposit these proceeds into domestic banks, and to use banking services, in order to conceal the source of the funds, cause them to appear legitimately earned, and spend them. Accordingly, drug traffickers often use and possess securities, checks, money orders, letters of credit, brokerage houses, real estate, shell corporations, and business fronts.

f.  Drug traffickers commonly maintain books or papers, which reflect names, addresses and telephone numbers of their associates in drug trafficking. They also store such information, as well as photographs, messages, and personal notes in electronic equipment including, but not limited to, computers, cellular phones, and other electronic software and mediums.

g.  Drug traffickers often take or cause to be taken photographs and video of themselves, their associates, their property, and evidence of their drug trafficking. These are usually maintained in devices they retain in their possession and residences.

h.  Drug traffickers commonly use cellular phones and other communications devices to keep in constant contact with their suppliers, associates, and clients in drug trafficking.

i.  Drug traffickers have been known to use computers and all electronic data processing units, to include all internal and external storage devices and related hardware and software that might include addresses or telephone

4

numbers in computerized files which reflect names, addresses and telephone numbers of their associates in drug trafficking. They also use computers to maintain and electronically record receipts, notes, ledgers, owe sheets, financial information, money orders, and other papers relating the transportation, ordering, sale, and distribution of controlled substances. Drug traffickers have also been known to use computers as a communications device to keep in constant contact with their suppliers, associates, and clients in drug trafficking through the use of internet service providers and electronic mail systems.

j.  Drug traffickers often keep paraphernalia for packaging, cutting, weighing, and distributing narcotics, and these paraphernalia include, but are not limited to, scales, plastic bags, cutting agents, and other items used to package and store drugs so they can be distributed without being easily detected.

7.  Law enforcement officers used multiple cooperating sources (hereinafter CS-1. CS-2, and CS-3) during this investigation. All of the CS' information has been corroborated through various investigative techniques, to include analysis of telephone toll records, and various surveillance techniques. Where possible, the information provided by the CS was corroborated through other cooperating sources. To my knowledge, none of the information that the CS' have provided to law enforcement has proved to be false, misleading or inaccurate in any material respect. For these reasons, I have deemed each CS's information to be reliable.

## II. Facts Establishing Probable Cause

8.  The DEA and LCSO are investigating the activities of a heroin and fentanyl drug trafficking organization (DTO) operating in and around Sterling, Virginia, within the Eastern

District of Virginia. Through call data record analysis, GPS monitoring, surveillance cameras, physical surveillance, and information obtained from confidential sources, investigators have identified several individuals working for the organization, including, NEDRICK LAMONT JOHNSON, a.k.a. "Rick," and "Ricky," who is the head of the DTO; NICHOLAS GEORGE MARCH, who is a re-distributor and courier for JOHNSON; KHEM NGUYEN, who is a re-distributor and runner for JOHNSON; RODNEY MALCOLM LIVENGOOD, who is a re-distributor and courier for JOHNSON; BROOKE LYNN BOWERS, who is a runner for JOHNSON; and LYNDSAY ERIN WOLTNER who is a re-distributor for JOHNSON.

9.     During the month of January 2019, law enforcement obtained cell phone pings for JOHNSON's, MARCH's, and LIVENGOOD's cell phones. Additionally, during January 2019, tracking devices were deployed on JOHNSON's, MARCH's, and WOLTNER's vehicles.

10.     On January 10, 2019, law enforcement debriefed a cooperating source (CS-1) who advised that he could purchase heroin from MARCH. CS-1 advised that he knew MARCH had sold heroin for over a year and was in a partnership with a man named "Rick." CS-1 positively identified "Rick" as JOHNSON in a known photo.

11.     On January 10, 2019, CS-1 contacted MARCH and asked to purchase $200 worth of heroin. CS-1 and MARCH agreed to meet at a location in Reston, Virginia.

12.     Investigators provided CS-1 with $200 in buy funds and followed CS-1 to the address in Reston, Virginia. Investigators saw a vehicle registered to MARCH and driven by MARCH pull into the parking lot and park near CS-1. Investigators watched CS-1 and MARCH meet outside of their vehicles. CS-1 and MARCH then returned to their vehicles and left the area.

13.     Following the controlled purchase, CS-1 provided investigators with a vape box that he had obtained from MARCH, which contained a plastic bag that held a grey powdery substance. The substance was sent to the Virginia Department of Forensic Science (DFS) for analysis and found to contain fentanyl.

14.     During the week of January 15, 2019, law enforcement debriefed a confidential source (CS-2) who advised that NGUYEN had recently reached out to him on Facebook using the user name "Khem Nguyen" and offered to sell CS-2 heroin. NGUYEN told CS-2 that he sells heroin for his guy who goes by the nickname "Ricky." Through this investigation "Ricky" has been identified as JOHNSON.

15.     On January 15, 2019, CS-2 contacted NGUYEN on Facebook messenger and asked to purchase one gram of heroin. NGUYEN told CS-2 that "his guy" would be good any time after 5:00 p.m.

16.     Investigators determined that NGUYEN and JOHNSON lived together at XXXX S. Williamsburg Court in Sterling, Virginia.

17.     Investigators conducted surveillance at the Williamsburg Court address prior to the controlled purchase. Investigators observed a vehicle registered to LIVENGOOD outside this residence. Investigators have determined that this vehicle is used by JOHNSON and LIVENGOOD.

18.     At approximately 5:08 p.m., investigators met with CS-2. Investigators instructed CS-2 to contact NGUYEN via Facebook messenger in their presence and to let NGUYEN know that CS-2 would be ready to meet in 30 minutes. NGUYEN responded and told CS-2 to come to the house and go around back. CS-2 asked NGUYEN how much it would be for one gram and NGUYEN replied that he was going to "ask him." Shortly after, NGUYEN replied that a gram

would be $150. Investigators provided CS-2 with $150 in buy funds and an audio recording device. A detective acting in an undercover capacity (UC-2) was also utilized. CS-2 and UC-2 drove together to the Williamsburg Court address.

19.     As CS-2 and UC-2 were on the way to the Williamsburg Court address, investigators observed NGUYEN exit the rear of the Williamsburg Court address and stand in the driveway. At approximately 5:47 p.m., CS-2 and UC-2 arrived at the Williamsburg Court address. NGUYEN approached the vehicle and engaged CS-2 through the passenger side window. CS-2 provided NGUYEN with the $150 in buy funds and NGUYEN provided CS-2 with a plastic bag containing a powdery substance consistent with heroin. NGUYEN told CS-2 to be careful with the heroin.

20.     Following the controlled purchase, CS-2 provided the suspected heroin to UC-2. Investigators field-tested the substance using a field test kit which was positive for heroin. The item was packaged and submitted to DFS for chemical analysis. The analysis is pending.

21.     On January 24, 2019, investigators conducted surveillance at the Williamsburg Court address. At 1:48 p.m., investigators observed the vehicle registered to LIVENGOOD, referenced in paragraph 17 arrive at the Williamsburg Court address. Investigators observed JOHNSON exit the front driver's side of the vehicle and walked to the rear of the Williamsburg Court address and entered the back basement door.

22.     At 2:11 p.m., investigators saw LIVENGOOD leave the Williamsburg Court address and get into a vehicle registered to MARCH, which is the same vehicle referenced in paragraph 12.

23.     At 2:28 p.m., investigators observed a vehicle park across the street from the Williamsburg Court address. At 2:30 p.m., BOWERS exited the Williamsburg Court address and

8

got into the passenger side of the vehicle. The vehicle made a loop around the neighborhood and dropped off BOWERS nearby at 2:34 p.m. Investigators then saw BOWERS go back into the Williamsburg Court address.

24.     On January 25, 2019, CS-2 contacted NGUYEN via Facebook and asked to purchase one gram of heroin and asked if NGUYEN's guy would do it for $140. NGUYEN advised that he would and asked CS-2 to meet him at the Williamsburg Court address to conduct the transaction.

25.     Investigators gave CS-2 an audio recording device, a covert video camera, and $140 in buy funds. CS-2 and UC-2 drove together to the Williamsburg Court address and arrived at approximately 5:35 p.m. CS-2 exited the vehicle and walked to the rear of the Williamsburg Court address where he met with NGUYEN. Investigators observed an exchange between CS-2 and NGUYEN. Investigators also heard CS-2 and NGUYEN talk about CS-2 getting to meet JOHNSON in the future. CS-2 returned to UC-2's vehicle and provided UC-2 with a plastic bag containing a powdery substance and CS-2 and UC-2 left the area.

26.     The substance was packaged and sent to the DEA Mid-Atlantic lab for chemical analysis. Analysis is pending.

27.     On January 29, 2019, law enforcement conducted surveillance at the Williamsburg Court address. At 1:55 p.m., investigators saw BOWERS exit the Williamsburg Court address and walk to a street corner. The same vehicle referenced in paragraph 23 stopped and picked up BOWERS. The vehicle drove around the block and dropped BOWERS off at the Williamsburg Court address. Investigators saw BOWERS reenter the Williamsburg Court address.

28.    Investigators watched this vehicle stop nearby and observed the driver and sole occupant apparently preparing to use drugs. Investigators approached the vehicle and saw suspected heroin in the vehicle. This individual, hereinafter referred to as CS-3, agreed to cooperate with investigators. The suspected heroin was packaged and sent to the DEA Mid-Atlantic lab for analysis. Analysis is pending.

29.    CS-3 told investigators that he had just purchased $100 of heroin from JOHNSON. CS-3 advised that he contacted JOHNSON on JOHNSON's cell phone and JOHNSON told CS-5 to come to the Williamsburg Court address and that he would send BOWERS out to serve him.

30.    CS-3 said that since February 2018, he has purchased between $100 and $500 of heroin every week from JOHNSON. CS-3 advised that on approximately eight to ten occasions JOHNSON sent MARCH to meet CS-3 if JOHNSON was not available. CS-3 said that on approximately three occasions, JOHNSON sent BOWERS to meet CS-3 if JOHNSON was not available. CS-3 advised that on approximately three to four occasions JOHNSON sent LIVENGOOD to meet CS-3 if JOHNSON was unavailable. CS-3 advised that LIVENGOOD is a courier for JOHNSON and makes runs to pick up heroin for JOHNSON.

31.    On February 1, 2019, CS-3 contacted JOHNSON through a third-party and arranged to purchase $450 worth of heroin from JOHNSON and also agreed to pay a $50 debt. JOHNSON told CS-3 to meet him at a shopping center in Sterling, Virginia, to conduct the transaction. JOHNSON instructed CS-3 to call him once CS-3 was at the location.

32.    Investigators met with CS-3 and provided him with $500 in buy funds and an audio recording device. While investigators were with CS-3, CS-3 received a text message from LIVENGOOD that asked him to call regarding the controlled purchase. CS-3 contacted

LIVENGOOD and LIVENGOOD told CS-3 to meet at a gas station in Sterling, Virginia, instead

of the shopping center. Investigators observed LIVENGOOD in the parking lot of the gas station

operating a vehicle registered to MARCH, which is the same vehicle referenced in paragraphs 12

and 22.

33.     CS-3 arrived at 8:47 p.m. and parked next to LIVENGOOD. CS-3 approached

LIVENGOOD and gave him the $500 in buy funds and LIVENGOOD provided CS-3 with a

baggie containing powder consistent with heroin.

34.     CS-3 provided the baggie to investigators. The substance was packaged and sent

to the DEA Mid-Atlantic laboratory for testing. Analysis is pending.

35.     Investigators reviewed tracking data as well as ping data prior to and following

the controlled purchase between CS-3 and LIVENGOOD. According to the records,

LIVENGOOD and the vehicle LIVENGOOD was operating were at the Hyatt House Hotel prior

to the controlled buy and went back to the Hyatt House Hotel immediately after the controlled

buy.

36.     On February 1, 2019, CS-2 contacted NGUYEN via Facebook and asked to

purchase one gram of heroin. NGUYEN advised CS-2 that "his guy" was waiting on more

product. NGUYEN would let CS-2 know when his source was ready. During this timeframe, law

enforcement monitored the GPS tracking device which was deployed on a vehicle registered to

MARCH on January 25, 2019. This is the same vehicle referenced in paragraphs 12, 22, 32, and

35. According to the tracking data, the vehicle departed from the Hyatt Place Hotel, at which

MARCH and LIVENGOOD resided at that time, and drove directly to the Williamsburg Court

address. The vehicle was at the Williamsburg Court address for a short period before it left and

proceeded directly to Baltimore, Maryland. Around the time that the vehicle returned to Virginia

from Baltimore, NGUYEN sent a Facebook message to CS-2 advising that "his guy" was good again.

37.     Investigators reviewed images from a surveillance camera in the area of the Williamsburg Court address and observed the vehicle arrive shortly after NGUYEN sent the Facebook message to CS-2. Surveillance video showed MARCH and LIVENGOOD exit the vehicle and walk to the back of the Williamsburg Court address. Surveillance camera images showed MARCH and LIVENGOOD leave the Williamsburg Court address a short time later and GPS tracking data showed the vehicle return to the Hyatt Place Hotel.

38.     Investigators, including UC-2, then met with CS-2 and gave him an audio recording device, a covert video camera, and $150 in buy funds. CS-2 got into UC-2's vehicle and they drove together to the Williamsburg Court address and arrived at 5:24 p.m.

39.     Once they arrived, CS-2 exited UC-2's vehicle and walked to the rear of the Williamsburg Court address, where he was let inside by NGUYEN. CS-2 asked NGUYEN if he would sell the gram of heroin for $130 instead of $140 and NGUYEN advised that he would have to check with "his guy." NGUYEN walked down the hall to a bedroom on the left side and NGUYEN could be heard talking to a male believed to be JOHNSON, who agreed to see the gram for $130. CS-2 provided NGUYEN with the $130 in buy funds in exchange for the plastic bag containing a powdery substance. CS-2 then exited the Williamsburg Court address, got back into the vehicle with UC-2 and provided UC-2 with the remaining buy funds as well as the plastic bag containing the suspected heroin.

40.     The substance was packaged and submitted to the DEA Mid-Atlantic lab for chemical analysis. Analysis is pending.

41.     On February 5, 2019, CS-2 contacted NGUYEN via Facebook and asked to purchase heroin. NGUYEN told CS-2 to come to the Williamsburg Court address later that day and he would introduce him to his guy.

42.     Investigators, including UC-2, gave CS-2 an audio recording device, covert video camera, and $450 in buy funds. CS-2 and UC-2 then drove to the Williamsburg Court address and arrived at approximately 5:40 p.m.

43.     CS-2 exited the vehicle and walked to the back door of the Williamsburg Court address and was let inside by NGUYEN. While inside the Williamsburg Court address, NGUYEN introduced CS-2 to JOHNSON. JOHNSON told CS-2 his prices for grams of heroin and said that if CS-2 was going to purchase from him [JOHNSON] daily, he would work on the prices. JOHNSON told CS-2 that he has people drive to the city for him to pick up heroin.

44.     CS-2 told JOHNSON that he was looking to purchase three grams of heroin. JOHNSON set three bags down on a table. JOHNSON said that two bags (which later were determined to contain a black rock like substance) were "shooters" and the third bag was the better stuff. JOHNSON told CS-2 that the cost of the three bags was $360. CS-2 provided JOHNSON with $360 in buy funds and left the Williamsburg Court address. CS-2 returned to UC-2's vehicle and provided UC-2 with the three bags containing suspected heroin.

45.     Investigators field-tested one of the rock-like substances, which was positive for heroin. All three of the bags were packaged and submitted to the DEA Mid-Atlantic lab for chemical analysis. Analysis is pending.

46.     Investigators monitored the tracking device data on MARCH's vehicle, and according to the tracking device data from January 25, 2019 to February 9, 2019, the vehicle left the Hyatt House Hotel daily and traveled to the Williamsburg Court address where it remained

13

for a short period of time. The vehicle then traveled to Baltimore, Maryland, where it stayed for a short period of time before driving back to the Williamsburg Court address. Once the vehicle returned to the Williamsburg Court address, it remained for a short period of time before returning back to the Hyatt House Hotel. Through surveillance cameras and physical surveillance in the area of the Williamsburg Court address and through physical surveillance at the Hyatt House Hotel, investigators determined that this vehicle is driven by LIVENGOOD and MARCH is usually a passenger in the vehicle. This observation is consistent with CS-3's statements that LIVENGOOD and MARCH are couriers for JOHNSON.

47.     On February 7, 2019, investigators executed a federal subpoena for records at the Hyatt House Hotel at Dulles Plaza. Through the subpoena, investigators learned that MARCH and LIVENGOOD resided at the Hyatt House Hotel beginning on January 21, 2019. From January 21, 2019 to February 7, 2019, MARCH and LIVENGOOD changed rooms six different times. Each of the rooms was booked using the Expedia website and paid for by credit card. Each of the rooms was reserved in MARCH's name.

48.     On February 9, 2019, LIVENGOOD and MARCH checked out of the Hyatt House Hotel. Tracking data, ping data, and physical surveillance show that LIVENGOOD and MARCH changed hotels to the Springhill Suites located at 22595 Shaw Road, Sterling, Virginia.

49.     From February 9, 2019 through the February 13, MARCH's vehicle was observed both physically and through tracking data to be at the Springhill Suites for the majority of each day. Every night, the vehicle remained at the Springhill Suites throughout the night.

50.     Starting February 9, 2019, MARCH's vehicle was observed through tracking data, physical surveillance, and electronic surveillance leaving the Springhill Suites each day and traveling to the Williamsburg Court address and conducting the exact same behavior as

14

described in paragraph 46. The vehicle then traveled to Baltimore, Maryland, where it stayed for a short period of time before driving back to the Williamsburg Court address. Once the vehicle returned to the Williamsburg Court address, it remained for a short period of time before returning back to the Springhill Suites.

51.     On February 14, 2019, an¹ unknown individual contacted the Loudoun County Sheriff's Office to report a suspicious vehicle parked on Williamsburg Road at Williamsburg Court in Sterling, Virginia. The caller advised that the vehicle had been parked in the same location for several days, and that neighbors from the area were looking at the vehicle to try to determine what it was doing there. The vehicle in question is the Loudoun County Sheriff's Office mobile surveillance vehicle outfitted with a surveillance cameras to capture activity at the Williamsburg Ct address.

52.     Investigators reviewed the video surveillance from the surveillance vehicle, and observed that at approximately 9:00 a.m., LIVENGOOD, NGUYEN, and BOWERS walked around the surveillance vehicle and looked into the windows of the surveillance vehicle. At approximately 10:00 a.m., LIVENGOOD was observed leaving the Williamsburg Court address in the vehicle described in paragraphs 17 and 21. At approximately 10:15 a.m., JOHNSON and BOWERS left the Williamsburg Court address with the homeowner, T.M., in a vehicle registered to T.M.

53.     Investigators reviewed tracker data during this time and determined that the vehicle that LIVENGOOD left the Williamsburg Ct address in and the vehicle that is registered to MARCH described in paragraphs 12, 22, and 32, were both in the parking lot of the Staybridge Suites at approximately 11:30 a.m. Detectives reviewed "ping" location data from JOHNSON's, LIVENGOOD's and MARCH's cell phones during this timeframe and determined

all three individuals to be "pinging" in the area of the Staybridge Suites located at 13700 Coppermine Road Herndon, Virginia, at approximately 11:30 a.m.

54.     On February 14, 2019, Detectives observed that two of the tires on the surveillance vehicle that LIVENGOOD, NGUYEN, and BOWERS were observed looking into had been slashed.

55.     On February 14, 2019, at approximately 2:45 p.m. detectives conducted physical surveillance on the Staybridge Suites Hotel. Detectives observed JOHNSON, MARCH, LIVENGOOD, and BOWERS all at the Staybridge Suites Hotel, coming and going from the second floor of building 13708.

56.     From February 14, 2019 through February 15, 2019, MARCH's vehicle and LIVENGOOD's vehicle were observed both physically and through tracking data to be at the Staybridge Suites Hotel for the majority of each day. On the night of February 14, 2019, the vehicles remained at the Staybridge Suites throughout the night.

57.     On February 15, 2019, LIVENGOOD and MARCH checked out of the Staybridge Suites Hotel. Tracking data, ping data, and physical surveillance show that LIVENGOOD and MARCH changed hotels to the Hawthorn Suites by Wyndham located at 21123 Whitfield Place in Sterling, Virginia.

58.     From February 15, 2019 through February 18, 2019 MARCH's vehicle was observed both physically and through tracking data to be at the Hawthorn Suites Hotel for the majority of each day. On the nights of February 15 through February 17, MARCH's vehicle remained at the Hawthorn Suites throughout the night.

59.     On February 18, 2019 LIVENGOOD and MARCH checked out of the Hawthorn Suites. Tracking data, ping data, and physical surveillance show that LIVENGOOD and

MARCH changed hotels to the Hyatt Place Herndon Dulles. MARCH's and JOHNSON's vehicles were observed through tracking data to be at the Hyatt Place Herndon Dulles during the day, as well as overnight on February 18, 2019.

60.     On February 18, 2019, JOHNSON's vehicle was observed leaving the Hyatt Place Herndon Dulles and traveling to the Williamsburg Court address and conducting the exact same behavior as described in paragraph 46. The vehicle then traveled to Baltimore, Maryland, where it stayed for a short period of time before driving to Martinsburg, West Virginia. The vehicle then traveled back to the Williamsburg Court address. Once the vehicle returned to the Williamsburg Court address, it remained for a short period of time before returning back to the Hyatt Place Herndon Dulles.

61.     "Ping" data from MARCH's and LIVENGOOD's cell phones also corroborates their movements to and from the Hyatt Place Herndon Dulles.

62.     On February 21, 2019, investigators observed MARCH and LIVENGOOD check out of the Hyatt Place Herndon Dulles. MARCH and LIVENGOOD then drove around to several hotels, remained at those locations for a short time, and then drove off. At approximately 1:20 p.m., MARCH and LIVENGOOD returned to the Hyatt Place Herndon Dulles. Investigators saw MARCH and LIVENGOOD remove bags from their vehicle and walk with them back into the hotel.

63.     An investigator served an administrative subpoena at the hotel. The investigator indicated that he was interested in the people who had checked out of the hotel this morning and then checked back in. The employee stated that he was familiar with those individuals and recalled that they had stayed at the hotel for several days. The employee asked the investigator for a name that the employee could use to search the hotel's computer. The investigator provided

MARCH's name and the employee responded that he had checked into room 615, the SUBJECT PREMISES. Investigators responded to the SUBJECT PREMISES and arrested MARCH and LIVENGOOD on outstanding federal warrants. A female was in the room with them. The SUBJECT PREMISES was secured pending the Court's consideration of this search warrant application.

### III. Conclusion

64.   Based on the information provided in this affidavit, I submit that probable cause exists to believe that evidence of narcotics trafficking in violation of 21 U.S.C. §§ 841(a)(1) and 846, specifically those items set forth in Attachment B, are contained within the SUBJECT PREMISES, further described in Attachment A. Accordingly, I respectfully request a warrant to search the SUBJECT PREMISES.

Julie Whisenhunt, Special Agent
Drug Enforcement Administration

Sworn and subscribed to before me the 21 day of February 2019.

/s/
Michael S. Nachmanoff
United States Magistrate Judge

The Honorable Michael S. Nachmanoff
United States Magistrate Judge

## ATTACHMENT A

## <u>LOCATION TO BE SEARCHED</u>

The address known as **13711 SAYWARD BLVD HERNDON, VIRGINIA 20171** is the

HYATT PLACE HERNDON DULLES HOTEL. It is six story hotel comprised of red brick and

light colored concrete. Attached to the center of the structure is an awning and the numbers

"13711" are affixed above the main lobby door in black lettering. The words "Hyatt Place" are

written on the top center of the structure above the front awning. **ROOM 615** is located on the

sixth floor of the hotel. The number 615, in white writing, is located on a brown placard to the

left of the door to the room.

## ATTACHMENT B

## PROPERTY TO BE SEIZED

1.      Drugs and drug paraphernalia, and items used in the sale, transfer, transportation, and packaging of illegal narcotics substances, as well as the use of illegal controlled substances, including scales, butcher paper, boots, plastic wrap, plastic bags, tape, cigarette papers, pipes, hypodermic needles and syringes, written articles on the use and effects of narcotics, diluents and cutting agents.

2.      Items used in the manufacture of illegal narcotics substances, including precursor chemicals, chemistry guides, glassware, and flasks.

3.      Documents related to or memorializing the ordering, purchasing, storage, transportation and sale of controlled substances, including U.S. currency used in the purchase and sale of controlled substances, buyer lists, seller lists, pay-owe sheets and records of sales, log books, drug ledgers, personal telephone and address books of customers and suppliers, rolodexes, telephone answering pads, bank and financial records, records relating to domestic and foreign travel such as tickets, passports, visas, credit card receipts, travel schedules, receipts and records, trucker log books, and storage records, such as storage locker receipts and safety deposit box rental records.

4.      Books, records, receipts, notes and other papers relating to the transportation, ordering, purchase and distribution of controlled substances.

5.      Address and telephone books and papers reflecting names, addresses, and telephone numbers.

6.      Books, records, receipts, bank statements, money drafts, letters of credit, money orders and cashier's checks, passbooks, bank checks, safe deposit box keys, and any other items evidencing the obtaining, secreting, transfer, concealment, storage, and expenditure of money.

7.   United States currency, precious metals, jewelry, and financial instruments.

8.   Photographs, in particular photographs of co-conspirators, assets, and controlled substances.

9.   Weapons, including but not limited to revolvers, semi-automatic pistols, rifles, and ammunition, magazines, bulletproof vests, and firearms-related paraphernalia including, but not limited to gun-cleaning kits, gun-sights, holsters, and receipts and documentation for the purchased of same, and related firearm paraphernalia.

10.   Cellular telephones, cameras, and records and receipts reflecting their ownership and use.

11.   Safes, both combination and key type, and their contents.

12.   Indicia of occupancy and residence of the premises including, but not limited to envelopes and keys.

13.   Any and all electronic data processing and storage devices, computers and computer systems, other digital media, keyboards, Central Processing Units, external and internal drives, external and internal storage devices such as magnetic tapes and disks or diskettes, together with system documentation, operating logs and documentation, software and instruction manuals, passwords, test keys, and encryption codes or similar codes that are necessary to access computer programs.

21